**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHYRREA JACKSON SEBREE,**<br><br>Plaintiff,<br><br>v.<br><br>**WEST PHARMACEUTICAL SERVICES, INC.,**<br><br>Defendant. | CIVIL ACTION<br><br>No. ____________________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Chyrrea Jackson Sebree, by her undersigned counsel, brings this Complaint against Defendant, West Pharmaceutical Services, Inc. ("West"), and in support alleges as follows:

## I. PRELIMINARY STATEMENT

1. This is an action for race discrimination in the enforcement of contracts under the Civil Rights Act of 1866, 42 U.S.C. § 1981, tortious interference with contractual relations under Pennsylvania law, and for a declaratory judgment that West's purported non-compete is void and unenforceable as applied to Ms. Sebree, an attorney.

2. Plaintiff Chyrrea Jackson Sebree is an African American attorney, admitted in the Commonwealth of Virginia and the United States Patent and Trademark Office as a registered patent attorney.

3. She served as a Vice President-level Associate General Counsel and West's Head of Intellectual Property until West involuntarily terminated her employment in a purported November 2025 reduction in force (the "RIF").

4. West's OWBPA Disclosure in the Separation Agreement as defined below, listed three attorneys in the decisional unit. Ms. Sebree, the only Black woman among them, was the only one selected. The two other listed attorneys are white, were retained and later promoted.

5. Her termination was part of a pattern. In Ms. Sebree's RIF and the reorganization that followed, West eliminated every executive-level attorney of color in its Legal Organization.

6. After West terminated her employment, Ms. Sebree was hired as an in-house lawyer for AptarGroup, Inc. ("Aptar") on June 15, 2026.

7. On July 2, 2026, West sent Sebree an email at her Aptar email address with a letter attachment (the "Sebree July 2 Letter"), among other things: (a) declaring her new employment with Aptar less than twelve months from her employment at West to be "**a breach**" of the "Non-Compete Agreement"; (b) threatening to enforce the "Non-Compete Agreement" against her and Aptar; (c) announcing that West "will monitor" both her and "Aptar's actions"; and (d) specifically stating "Finally, ***as an attorney***, you know you also have professional conduct obligations that survive your representation of West." (Emphasis added); *See* Sebree July 2 Letter, **Exhibit A**. West's counsel also sent the letter to Ms. Sebree overnight mail.

8. Ms. Sebree immediately forwarded a copy of the Sebree July 2 Letter to Aptar's General Counsel to provide notice of West's claims.

9. Notably, West's attorney omitted any reference in the Sebree July 2 Letter to its own professional conduct obligations under Pa. RPC 5.6, which expressly states that "[a]n agreement restricting the right of lawyers to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose a lawyer." Pa. RPC 5.6, Comment 1. West, acting through its General Counsel and an attorney who knowingly is also

subject to Pa. RPC 5.6, intentionally ignored its obligations under the applicable Rules of Professional Conduct, particularly Rule 5.6.

10. Also on July 2, 2026, West sent a similar letter to Aptar's General Counsel which referenced "Ms. Sebree's role as an attorney" at West and, among other things, omitted any reference to Pa. RPC 5.6. Rather, it specifically stated that "West is currently evaluating its options in enforcing obligations agreed to between Ms. Sebree and West in the Non-Compete Agreement." (the "Aptar July 2 Letter").

11. The Aptar July 2 Letter also specifically stated that "West expects that Ms. Sebree and Aptar understand and comply with all of Ms. Sebree's obligations owed to West going forward."

12. Twenty-five days later, after communications directly between West and Aptar, and as a direct result of West's threats to enforce the non-compete, Aptar terminated Ms. Sebree's employment effective July 27, 2026.

13. West did not treat similarly situated white executives the same way.

14. For instance, in May 2025, Emily Oberlee, a white female and West's former Vice President of Global Supply Chain, left West for a similar position at Becton, Dickinson and Company ("BD"), a company West's own covenant names as a competitor.

15. West agreed not to enforce its non-compete covenants against Ms. Oberlee, upon information and belief, because Ms. Oberlee represented that her new position and responsibilities were not competitive to West.

16. By way of further example, West did not require a non-compete of Douglas Bruno, a white male and former Vice President and Associate General Counsel who held the same title as Ms. Sebree during their overlapping employment at West, resigned in 2022 to

become General Counsel of Stevanato Group one month later. Stevanato Group is a named competitor to West.

17. West relied solely on the terms of Mr. Bruno's confidentiality agreement and his duties as an attorney and to protect its interests.

18. Contrary to her white former colleagues, West enforced a non-compete covenant against Ms. Sebree, a 62-year-old Black female attorney working solely in a legal capacity, and waived it for Ms. Oberlee, a white executive working in a business capacity for a named competitor.

19. West's selective enforcement, which ended her Aptar employment, denied her the same right to make and enforce contracts "as is enjoyed by white citizens," 42 U.S.C. § 1981(a), and cost her a legal career at Aptar or any other employer that West unilaterally deems to be competitive.

## II. THE PARTIES

20. Plaintiff Chyrrea Jackson Sebree is an adult individual and a citizen of the State of Delaware who resides in Middletown, Delaware. She is a 62-year-old, African American female.

21. Defendant West Pharmaceutical Services, Inc. is a Pennsylvania corporation with its principal place of business at 530 Herman O. West Drive, Exton, Chester County, Pennsylvania 19341.

22. West manufactures containment and delivery systems for injectable drugs and healthcare products.

23. At all relevant times, West acted through its officers, managers, attorneys, and employees, including David M. Lafkas, Senior Counsel and Head of IP, and Norman D. Finch,

Jr., Senior Vice President, General Counsel and Corporate Secretary, each acting within the scope of his employment.

## III. JURISDICTION AND VENUE

24. This Court has subject-matter jurisdiction over Count I under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because it arises under 42 U.S.C. § 1981.

25. This Court has supplemental jurisdiction over Counts II and III under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as Count I. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

26. In addition and in the alternative, this Court has diversity jurisdiction over all claims under 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of Delaware, where she is domiciled. West is a citizen of Pennsylvania, where it is incorporated and maintains its principal place of business. The amount in controversy exceeds $75,000, exclusive of interest and costs.

27. This Court has personal jurisdiction over West because it is incorporated and maintains its principal place of business in Pennsylvania.

28. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2). West resides in this District, and the July 2, 2026 letter at issue was issued from West's Exton headquarters.

29. Venue is also consistent with the forum-selection clauses in the agreements West invoked against Ms. Sebree, each of which designates the state courts of Chester County, Pennsylvania or the United States District Court for the Eastern District of Pennsylvania. *See* Non-Compete Agreement § 3; RSU Agreement § 17.

30. No administrative exhaustion is required before bringing a claim under 42 U.S.C. § 1981. This action is timely under the four-year limitations period that governs § 1981 claims arising under the 1991 amendments.

## IV. FACTUAL ALLEGATIONS

### A. West Hires Ms. Sebree as an Executive Attorney and Head of IP

31. By letter dated March 23, 2022, West offered Ms. Sebree the position of Associate General Counsel, Lead Business Partner R&D, D&T, Regulatory and Head IP, an executive-level attorney position based at West's Exton global headquarters.

32. In this position, Ms. Sebree reported directly to West's General Counsel, overseeing the company's intellectual property attorney team and coordinating legal support across all disciplines to the Research and Development, Digital and Technology, and Regulatory Affairs groups.

33. On March 24, 2022, as a condition of her employment, Ms. Sebree electronically signed West's form Non-Compete and Non-Solicitation Agreement (the "Non-Compete Agreement"), effective May 16, 2022. A true and correct copy is attached as **Exhibit B**.

34. Notwithstanding that the Non-Compete Agreement was a condition of her employment, Ms. Sebree signed the Non-Compete Agreement with the understanding that the non-compete covenant could apply in the event she was transferred from the Legal Organization to a business unit within West where she no longer reported to the General Counsel or otherwise provided attorney advice.

35. Section 1 of the Non-Compete Agreement provides that, for 12 months after termination of employment, the employee shall not "work for or be engaged by, or concerned or interested in . . . any business which in any way competes with the business of the Company"

within a "Restricted Area" defined as "any area in the world" in which the employee was actively engaged for West.

36. Section 1 further lists entities whose employment West "deem[s] to be competitive," including "Stevenato Group (Ompi)", "Aptar-Stelmi Group," "Becton Dickinson", and states that the list "is not exhaustive."

37. The Non-Compete Agreement does not exclude attorneys from its effect.

38. Ms. Sebree began work at West on or about May 16, 2022, and remained in her executive role for approximately three and one-half years.

39. Ms. Sebree performed well throughout her employment. Her performance ratings were consistently favorable, at or above "meets expectations," and she earned an annual bonus every year.

40. Throughout her tenure, Ms. Sebree served as Secretary to the Technology and Innovation Committee of West's Board of Directors until the committee was dissolved in 2025.

41. Ms. Sebree led the legal intellectual property workstreams for West's approximately $100 million divestiture to AbbVie, which West completed in 2026.

42. During her employment, West reassigned Ms. Sebree's business-partner responsibilities, first from Digital Transformation to Quality, and later from Head of IP to provide legal support for newly created Operating Units. These changes were not related to her performance.

43. As West's attorney, Ms. Sebree is, was and continues to be bound by the Rules of Professional Conduct, including the duties of confidentiality to current and former clients under Pa. RPC 1.6 and 1.9 and VA RPC 1.6 and 1.9. Those duties protect West's privileged and confidential information of existing and former clients independent of any restrictive covenant.

44. Ms. Sebree had access to West confidential information, but not to its trade secrets.

**B. The 2025 RSU Award, Forfeited in Full**

45. On February 18, 2025, West granted Ms. Sebree 178 restricted stock units under its 2016 Omnibus Incentive Compensation Plan (the "RSU Agreement"), which she accepted electronically on April 24, 2025. A true and correct copy of the RSU Agreement is attached as **Exhibit C**.

46. The RSUs were scheduled to vest in four installments: 45 units on February 20, 2026; 45 on February 20, 2027; 44 on February 20, 2028; and 44 on February 20, 2029.

47. Section 7(c) of the RSU Agreement contains a 12-month post-employment restrictive covenant substantively identical to Section 1 of the Non-Compete Agreement, including the same list of deemed competitors.

48. There is no exclusion of attorneys from the noncompete language contained in the RSU Agreement.

49. Section 4(a) of the RSU Agreement provides that unvested RSUs are "forfeited immediately" upon a termination of service for any reason other than death, disability, or qualifying retirement.

50. Because West terminated Ms. Sebree's employment on November 28, 2025, all of her RSUs were forfeited per the RSU Agreement.

51. Accordingly, Ms. Sebree received no shares under the RSU Agreement.

52. West nonetheless invoked the noncompete language in the RSU Agreement against her.

### C. West Selects Its Only Black Executive-Level Attorney in the Decisional Unit for Termination and Eliminates Its Other Executive Attorneys of Color

53. In early November 2025, West informed Ms. Sebree that it was eliminating her position as part of an involuntary "group employment termination program."

54. West's Employment Termination Program Disclosure (the "OWBPA Disclosure"), prepared as of November 11, 2025, identified the decisional unit as "the Legal Organization" and stated that employees were selected based on "job function, skills and job performance."

55. Of the three attorneys listed in the disclosure, West selected only one for termination: Ms. Sebree - a 62-year-old Associate General Counsel.

56. West retained a 51-year-old Associate General Counsel and a 44-year-old Senior Counsel. Upon information and belief, both of the retained attorneys are white.

57. Ms. Sebree was the only Black woman, and the only attorney of color, among the three attorneys West listed.

58. Ms. Sebree was as qualified as, or more qualified than, the two white attorneys West retained.

59. By way of example only, she held an executive-level Associate General Counsel position, served as West's Head of IP, served as Secretary to a Board committee throughout her tenure, led the intellectual property workstreams for the AbbVie divestiture, received consistently favorable performance ratings, and earned a bonus every year.

60. After her termination in November 2025, West reassigned Ms. Sebree's Head of IP function to Mr. Lafkas, a white non-executive attorney who had reported to her.

61. In 2026, West promoted both white attorneys listed in the OWBPA Disclosure.

62. Under the Separation Agreement and General Release (the "Separation Agreement"), Ms. Sebree's employment ended on November 28, 2025.

63. West agreed to pay Ms. Sebree severance equal to 28 weeks of pay through June 12, 2026, plus a pro-rated 2025 bonus, continued health-care contributions during the 28-week severance period, and provide outplacement services.

64. The 12-month non-competition period under the Non-Compete Agreement ran from November 28, 2025 through November 28, 2026.

65. West's severance, however, covered only the first 28 weeks. For the remaining approximately 24 weeks, from June 12 through November 28, 2026, West claimed the right to bar Ms. Sebree from practicing law at Aptar or any other "competitor" while paying her nothing.

66. Ms. Sebree's selection for reduction was part of a pattern.

67. In the 2025–2026 reduction in force and the reorganization that followed, West terminated every executive-level attorney of color in its Legal Organization:

(a) Ms. Sebree, who is Black, Associate General Counsel and Head of IP, terminated effective November 28, 2025;

(b) Barbara O'Neil, who is Hispanic (Cuban-American), Vice President and Associate General Counsel; and

(c) Jessica Colon, who is Hispanic (Puerto Rican), Vice President and Associate General Counsel.

68. During the same period, West retained and promoted its white attorneys:

(a) Ryan Metz, a white male and Vice President and Associate General Counsel, was promoted to Deputy General Counsel;

(b) Sarah Starr, a white woman, was promoted from Senior Corporate Counsel to Vice President and Associate General Counsel in 2026; and

(c) David M. Lafkas, a white male and non-executive Corporate Counsel who had reported to Ms. Sebree, was elevated to Head of IP, Ms. Sebree's former role.

69. West's pattern of terminating its executive attorneys of color, while retaining and promoting white attorneys, and selectively enforcing the noncompete against her, was discriminatory.

70. Upon information and belief, West's reduction in force of one (Ms. Sebree) and the elimination of West's executive attorneys of color, creates a strong inference of West's discriminatory intent in the selective enforcement of the non-compete against Ms. Sebree.

**D. Ms. Sebree Joins Aptar**

71. By letter dated June 10, 2026, Aptar offered Ms. Sebree the position of Vice President, North America Commercial Operations & Pharma Business Partner, reporting to Aptar's Executive Vice President, Chief Legal Officer and Corporate Secretary.

72. The position is a legal role. It leads legal support for Aptar's North American business and serves as primary legal counsel to Aptar's pharma segment leadership.

73. Aptar's offer conditioned the role on Ms. Sebree's authorization to practice law in New York as in-house counsel.

74. The position carried a significant base salary, a short-term incentive, a long-term incentive beginning in 2027, employer retirement contributions, and full health and other benefits.

75. Ms. Sebree accepted Aptar's offer on June 10, 2026 and began work on June 15, 2026, after her paid severance period ended on June 12, 2026.

76. To the extent relevant, Ms. Sebree did not work for Aptar during any period for which West paid her.

77. Ms. Sebree has not disclosed West's privileged or confidential information to Aptar or anyone else, and has not solicited any West customer or employee.

78. Ms. Sebree accepted the position at Aptar at age 62 with full intention to work at Aptar until her retirement at age 67.

## E. West Declares Ms. Sebree in Breach and Threatens Enforcement

79. On July 2, 2026, West, acting through its attorneys, sent Ms. Sebree an email to her Aptar email address attaching a letter captioned "Breach of Agreement and Reminder of Obligations" and also by overnight delivery to her home address enclosing the Non-Compete Agreement and RSU Agreement. *See* Sebree July 2 Letter, **Exhibit A**.

80. David M. Lafkas, West's Senior Counsel and Head of IP, signed the letter and copied West's General Counsel, Norman D. Finch, Jr.

81. Mr. Lafkas is the white male attorney who previously reported to Ms. Sebree and who West elevated into her former Head of IP role.

82. The Sebree July 2 Letter stated that West had "recently learned" that Ms. Sebree had "started a new position at AptarGroup, Inc. ('Aptar'), a direct competitor of West."

83. It stated that "it was troubling to learn that you have directly engaged employment with a West competitor in less than twelve months from your termination of employment from West. West considers this a **breach** of your obligations owed to West." (Emphasis added)

84. It stated that "West is currently evaluating its options in enforcing obligations agreed to between you and West in the Non-Compete Agreement and RSU Agreement."

85. It asserted that West's trade secrets were among the information to which Ms. Sebree had been privy, which was knowingly false.

86. It warned that "West will monitor your compliance with these obligations and Aptar's actions," and demanded that Ms. Sebree acknowledge receipt in writing by July 9, 2026.

87. The Sebree July 2 Letter did not identify any disclosure of confidential information, any solicitation, or any other misconduct. The only "**breach**" it identified was the fact of Ms. Sebree's employment with Aptar.

### F. Aptar Terminates Ms. Sebree Because of West's Threats

88. Also on July 2, 2026, West sent a similar letter to Aptar's General Counsel asserting its purported rights under the Non-Compete Agreement.

89. As a direct result of West's written letters to Ms. Sebree and Aptar, the threats made therein, and West's subsequent communications to Aptar's General Counsel, Aptar terminated Ms. Sebree's employment effective July 27, 2026, twenty-five days after the July 2 Letter.

90. Aptar raised no concern about Ms. Sebree's performance before the Aptar July 2 Letter.

91. But for West's threats, and the conduct described above, Ms. Sebree would have remained employed by Aptar.

92. Ms. Sebree has not obtained comparable employment since Aptar terminated her despite her diligent efforts.

**G. West Waived Its Non-Compete for Emily Oberlee, a White Business Executive**

93. Emily Oberlee is a white woman who was formerly employed by West as Vice President of Global Supply Chain, an executive-level position.

94. Ms. Oberlee's role at West was purely a business role. She was not employed by West as an attorney.

95. Upon information and belief, at the time of her separation, Ms. Oberlee was subject to the same or a substantially similar non-compete agreement as Ms. Sebree, including the same 12-month restriction and the same list of deemed competitors.

96. In or about May 2025, Ms. Oberlee left West and was hired by Becton Dickinson in a position similar to the one she held at West.

97. West's form covenant expressly names "Becton Dickinson" as a competitor of West.

98. Upon information and belief, Ms. Oberlee asked West to waive her non-compete on the ground that her new position would not be in a role competitive with West.

99. Upon information and belief, based upon Ms. Oberlee's representations regarding the scope of her new duties as Becton Dickinson, West agreed not to enforce its non-compete against Ms. Oberlee.

100. Similar to Ms. Oberlee, Ms. Sebree's role as an attorney at Aptar was knowingly not competitive, and West was additionally protected by Ms. Sebree's independent obligations as an attorney to comply with the Rules of Professional Conduct.

101. Just as West had no legitimate business interest in enforcing its non-compete against Ms. Oberlee, it had no legitimate business interest in enforcing the same covenant against Ms. Sebree, who worked for Aptar solely in a legal capacity.

102. West did not offer Ms. Sebree the waiver even after it became aware that she was working solely in a legal capacity as an attorney at Aptar.

**H. West Did Not Require a Non-Compete from Douglas Bruno, a former White Executive Attorney**

103. Douglas Bruno is a white male and was previously employed by West as Vice President and Associate General Counsel, the same executive level as Ms. Sebree.

104. Like Ms. Sebree, Mr. Bruno served as Secretary to the Innovation and Technology Committee of West's Board of Directors. He also served as Secretary of the Board's Audit Committee and Finance Committee.

105. In his role at West, Mr. Bruno advised senior management on corporate, commercial, securities, mergers and acquisitions, litigation, licensing and intellectual property, and regulatory matters; advised on West's public disclosures, including SEC filings and earnings announcements; and played a key legal role in significant strategic transactions. He had access to West's corporate strategy, its acquisition plans, and confidential information at least as extensive as Ms. Sebree's.

106. West, however, did not require Mr. Bruno to sign a non-compete agreement. Mr. Bruno was bound only by a confidentiality agreement with West.

107. In or about late summer 2022, Mr. Bruno voluntarily resigned from West.

108. In September 2022, the following month, he became General Counsel of Stevanato Group S.p.A. (NYSE: STVN), a publicly traded competitor of West.

109. As Stevanato's General Counsel, Mr. Bruno leads its global legal and compliance function, advises its board and executive leadership on enterprise strategy and transactions, oversees intellectual property protection, and negotiates major commercial agreements with global pharmaceutical customers.

110. Mr. Bruno's move to Stevanato was public.

111. Mr. Bruno's move posed a far greater competitive risk than Ms. Sebree's. He resigned voluntarily, joined a competitor West had named in its own covenant, and became that competitor's chief legal officer within one month.

112. West relied solely on his confidentiality agreement to protect its interests.

113. Accordingly, at a minimum, Ms. Sebree was subject to a non-compete as a lawyer, while Mr. Bruno was not.

114. Further, unlike Mr. Bruno, West terminated Ms. Sebree involuntarily, while Mr. Bruno resigned voluntarily, yet both worked for a deemed competitor as attorneys.

115. Accordingly, West did not have a legitimate business interest in subjecting Ms. Sebree to a non-compete covenant, while not subjecting Mr. Bruno to such a restriction, notwithstanding that they held similar positions and their tenure overlapped.

116. Further, West's conduct did not, and could not, protect any legitimate business interest in compelling an attorney to comply with the Non-Compete Agreement.

117. Collectively, West's conduct, including the reduction in force and the termination of West's executive attorneys of color, was evidence of West's discriminatory intent in the selective enforcement of the Non-Compete Agreement against Ms. Sebree.

## I. West's Enforcement Position Lacks Legitimate Justification

118. West's stated reason for targeting Ms. Sebree, protection of its confidential information, trade secrets, and business interests, is a pretext for discrimination. Among other things:

(a) The non-compete restriction was void *ab initio* because Pennsylvania Rule of Professional Conduct 5.6(a) prohibits a lawyer from participating in

offering or making an employment agreement that restricts a lawyer's right to practice after the relationship ends[1];

(b) West, not Ms. Sebree, ended the employment relationship, through an involuntary reduction in force;

(c) West sought to bar Ms. Sebree from practicing her profession for a year, and approximately 24 weeks for which it provided no compensation, after terminating her without cause;

(d) Ms. Sebree forfeited all of her RSUs on termination and received no consideration under the RSU Agreement West;

(e) Despite her role as Head of IP, West did not permit Ms. Sebree to have access to West's trade secrets (a fact known by Mr. Lafkas), and West's privileged and confidential information is fully protected by her professional obligations and separate confidentiality undertakings; and

(f) West waived the same restriction for Ms. Oberlee, a white business executive who joined a named competitor in a similar role, and required no non-compete at all of Mr. Bruno, a white executive attorney who became General Counsel of a named competitor, demonstrating that West does not regard such restrictions as necessary to protect a legitimate business interest.

---

[1] *See also* Pa. RCP Comment 1: "An agreement restricting the right of lawyers to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose a lawyer. Paragraph (a) prohibits such agreements except for restrictions incident to provisions concerning retirement benefits for service with the firm. This comment is consistent with the Model Rules of Professional Conduct for Rule 5.6.

**J. Harm to Ms. Sebree**

119. As a direct and proximate result of West's conduct, Ms. Sebree lost her position at Aptar and the compensation and benefits that came with it, including her 2026 short-term incentive, long-term incentive, bonuses, and other employee benefits.

120. Ms. Sebree has incurred and will incur significant attorneys' fees and costs in responding to West's threats.

121. Ms. Sebree has suffered emotional distress, humiliation, anxiety, and damage to her professional reputation from being branded in "breach" of her obligations as an attorney, placed under West's announced "monitor[ing]," threatened with enforcement of the admittedly unenforceable non-compete, and ultimately terminated by her new employer within weeks of starting.

122. West acted intentionally, with malice, and with reckless indifference to Ms. Sebree's federally protected rights, her obligations under Pa. RPC, her right under Pa. RPC 5.6 to practice law, and in violation of Pa. RPC 5.6.

123. West's Legal Organization had a heightened obligation to comply with Pa. RPC 5.6, but blatantly and knowingly chose to ignore this established tenet within the practice of law.

**COUNT I**

**Race Discrimination in the Enforcement of Contracts (Selective Enforcement)**
**42 U.S.C. § 1981**

124. Plaintiff incorporates the above paragraphs as if fully set forth here.

125. Section 1981 guarantees all persons "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "Make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

42 U.S.C. § 1981(b). These rights are protected against impairment by private actors. 42 U.S.C. § 1981(c).

126. Ms. Sebree is African American and a member of a protected class under § 1981.

127. Ms. Sebree had an existing employment relationship with Aptar for employment in their Legal function as Vice President, North America Commercial Operations & Pharma Business Partner.

128. West extended to its white former executive, Ms. Oberlee, the benefit and privilege of a waiver of its restrictive covenant, permitting her to earn a living by joining a named competitor in a similar business role without objection.

129. West denied that same benefit and privilege to Ms. Sebree.

130. By declaring Ms. Sebree in breach, threatening enforcement, and announcing that it would monitor her and Aptar, West impaired Ms. Sebree's right to make, perform, and enjoy the benefits of her employment with Aptar on the same terms as former white employees, and caused Aptar to terminate that employment.

131. West acted with intent to discriminate on the basis of race.

132. Ms. Oberlee was similarly situated to Ms. Sebree in all material respects. Both were West executives, both were subject to the same or a substantially similar form covenant, and both joined companies West deems competitors within the restricted period.

133. To the extent they differed, the differences favored Ms. Sebree: Ms. Oberlee joined a named competitor in a business role similar to her West role, while Ms. Sebree joined Aptar solely as an attorney as she was expressly permitted and had a right to do under Rule 5.6.

134. West treated Ms. Oberlee more favorably than Ms. Sebree, despite Mr. Oberlee's purely business role at West.

135. West also treated Mr. Bruno, its white executive attorney, more favorably than Ms. Sebree. It did not require Mr. Bruno to be subject to a non-compete covenant, and therefore, could not attempt to restrict him from working as the General Counsel of a named competitor – notwithstanding that their tenures overlapped for a period of time.

136. West's discriminatory intent is further shown by its elimination of every executive-level attorney of color in its Legal Organization while retaining and promoting white attorneys, including the attorney who signed the Sebree July 2 Letter and Aptar July 2 Letter.

137. West's selective enforcement continued the same race-based course of conduct by which it selected Ms. Sebree for termination.

138. Having ended her employment because of her race, West then used its noncompete covenant, which it had waived for a white executive, to end her employment with Aptar.

139. West's justifications for asserting its purported rights under the Non-Compete Agreement, which was void *ab initio* to the extent it applied to Ms. Sebree as an attorney, are a pretext for race discrimination.

140. As a direct and proximate result of West's violation of §1981, Ms. Sebree has suffered lost wages and benefits, emotional distress, humiliation, and reputational harm.

141. West acted with malice or reckless indifference to Ms. Sebree's federally protected rights, entitling her to punitive damages.

142. Ms. Sebree is entitled to recover her reasonable attorneys' fees and costs under 42 U.S.C. § 1988(b).

**COUNT II**

**Tortious Interference with Existing Contractual Relations**
**Pennsylvania Common Law**

143. Plaintiff incorporates the above paragraphs as if fully set forth here.

144. Ms. Sebree had an existing employment relationship with Aptar for employment as Vice President, North America Commercial Operations & Pharma Business Partner as an attorney.

145. In this role, Ms. Sebree provided legal support for Aptar's North America Commercial Operations and globally for the Pharma Business Segment.

146. West knew of Ms. Sebree's employment relationship as an attorney with Aptar no later than July 2, 2026.

147. West acted purposefully and with the specific intent to harm that relationship by declaring Ms. Sebree's employment with Aptar a "breach," threatening to enforce its covenants, and announcing that it "will monitor . . . Aptar's actions," and by sending a letter to Aptar regarding Ms. Sebree's alleged breach.

148. West's conduct was intended to, and did, induce Aptar to terminate Ms. Sebree's employment, which Aptar did effective July 27, 2026.

149. Aptar's termination of Ms. Sebree was the desired result of the Sebree July 2 Letter, Aptar July 2 Letter, and its subsequent conduct and/or communications with Aptar.

150. West's conduct was not privileged or justified.

151. West did not act in good faith to protect a legitimate interest since it knew, as a Legal Organization, that it could not restrict Ms. Sebree's right to practice law with Aptar under the express provisions of Rule 5.6; that Ms. Sebree had a perpetual obligations of confidentiality

and attorney-client privilege to West under the applicable Rules of Professional Conduct, and was not in possession of any West trade secrets.

152. Further, it selectively invoked its covenants against Ms. Sebree because of her race while waiving them for Ms. Oberlee, continuing the discrimination that ended her Aptar employment; it sought to restrict her right to practice law in violation of Pa. RPC 5.6(a); it forced Ms. Sebree to forfeit her units under her RSU Agreement with West; it targeted Ms. Sebree who was subject to a RIF and had not voluntarily resigned; it sought to keep her out of work for a year, including approximately 24 weeks for which it paid her nothing; and if Ms. Sebree were to seek employment, West has veto power as West requires her to obtain their permission for any entity that competed in any way, anywhere in the world, in violation of public policy per the Rules of Professional Conduct.

153. Considering West's motive, the nature of its conduct, the interests it sought to advance, and the interest of Ms. Sebree and Aptar in their contractual relationship, West's interference was improper and intentional.

154. As a direct and proximate result of West's interference, Ms. Sebree has suffered actual damage, including the loss of her Aptar employment and its compensation and benefits, emotional distress, and harm to her professional reputation, and attorneys' fees incurred in responding to West's threats, emotional distress, and harm to her professional reputation.

155. West's conduct was outrageous, intentional, and in reckless disregard of Ms. Sebree's rights and established public policy, entitling her to punitive damages under Pennsylvania law.

156. West's Legal Organization and its attorneys had a heightened obligation to comply with Pa. RPC 5.6 with respect to Ms. Sebree, but instead, knowingly chose to ignore its provisions.

**COUNT III**

**Declaratory Judgment**
**28 U.S.C. §§ 2201–2202**

157. Plaintiff incorporates the above paragraphs as if fully set forth here.

158. An actual, substantial, and justiciable controversy exists between Ms. Sebree and West regarding the validity and enforceability of Section 1 of the Non-Compete Agreement and Section 7(c) of the RSU Agreement (together, the "Non-Compete Provisions").

159. West has declared in writing that Ms. Sebree's employment with Aptar was "a breach of [her] obligations owed to West," and that it is "evaluating its options in enforcing" the Non-Compete Provisions. West has not withdrawn that position.

160. The controversy does not end when the 12-month restricted period expires on November 28, 2026.

161. West may still seek damages, forfeiture, or recoupment for the alleged breach, including under the clawback provisions of the RSU Agreement.

162. Upon information and belief, West will also contend that the restricted period is extended by the time Ms. Sebree worked for Aptar, which would purport to restrain her beyond November 28, 2026.

163. The validity (including whether the Non-Compete Provisions are overbroad) and duration of the Non-Compete Provisions also bear directly on whether West's conduct was privileged or justified under Count II.

164. Ms. Sebree has been, and remains, an attorney licensed to practice law.

165. West employed her as an attorney, and the Non-Compete Provisions restricted her ability to practice law as in-house counsel after her employment with West ended.

**A. The Non-Compete Provisions Violate Pennsylvania Public Policy as Applied to Attorneys**

166. Further, Pennsylvania Rule of Professional Conduct 5.6(a) provides that a lawyer shall not participate in offering or making an employment or similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement.

167. Rule 5.6 protects both the professional autonomy of lawyers and the freedom of clients to choose a lawyer. Pa. RPC 5.6 cmt. [1].

168. West's in-house lawyers offered, required, and now seek to enforce the Non-Compete Provisions against Ms. Sebree, a lawyer, to prevent her from practicing law after her employment ended.

169. Because the Non-Compete Provisions restrict an attorney's right to practice law after the end of her employment, they are contrary to the public policy of the Commonwealth embodied in Rule 5.6(a) and are void and unenforceable as applied to Ms. Sebree.

**B. West Has No Legitimate Business Interest in Enforcing a Non-Compete Against an Attorney**

170. Under Pennsylvania law, a restrictive covenant is enforceable only if it is reasonably necessary to protect a legitimate business interest of the employer, such as trade secrets, confidential information, customer goodwill, or specialized training. A covenant whose purpose is to eliminate competition or restrict an individual's ability to earn a living is not enforceable.

171. Every legitimate interest West could assert in restraining a former in-house attorney is already fully protected by other means.

172. West's privileged and confidential information is protected by Ms. Sebree's duties of confidentiality under Pa. RPC 1.6 and 1.9, by the attorney-client privilege, by the Pennsylvania Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016, and by Ms. Sebree's separate confidentiality undertakings, which she reaffirmed in the Separation Agreement.

173. An in-house attorney has no customers of her own and no customer goodwill to divert.

174. Ms. Sebree had no access to West's trade secrets.

175. Beyond those protections, the only effect of a non-compete on a former in-house attorney is to bar her from practicing law for a new client. This is an improper restraint on the practice of law and on competition, and not a legitimate business interest.

**C. West's Selective Enforcement Shows It Has No Legitimate Business Interest**

176. West's own conduct confirms that the Non-Compete Provisions are not necessary to protect any legitimate business interest, as to Ms. Sebree or as to West's attorneys generally.

177. West waived its non-compete for Ms. Oberlee, a white business executive who joined Becton Dickinson, a named competitor, in a business role similar to the one she held at West.

178. Just as West had no legitimate business interest in enforcing its non-compete against Ms. Oberlee, it had none in enforcing the same covenant against Ms. Sebree, who worked for Aptar solely in a legal capacity.

179. West also did require a non-compete covenant from Douglas Bruno, a Vice President and Associate General Counsel with broader access than Ms. Sebree to West's corporate strategy, acquisition plans, and public-company information.

180. The tenures of Mr. Bruno and Ms. Sebree at West overlapped for some period in 2022.

181. West's enforcement against Ms. Sebree alone shows that its purpose was not to protect a legitimate business interest.

**D. The Non-Compete Provisions Are Overbroad**

182. Ms. Sebree is an intellectual property attorney whose 29-year legal career has been devoted to innovative sciences related products, including pharmaceuticals, medical devices, materials, and component parts.

183. The Non-Compete Agreement bars Ms. Sebree from working "for or be[ing] engaged by, or concerned or interested in . . . any business which in any way competes with the business of the Company," in any capacity.

184. The "Restricted Area" is defined as "any area in the world" in which Ms. Sebree was engaged for West. As West's Head of IP supporting its global business, that area is effectively worldwide.

185. West's list of deemed competitors is expressly "not exhaustive," and West reserves the right to deem additional entities competitive "in the future."

186. Because West's products are used throughout the pharmaceutical, medical devices, materials, component parts supply chain, a business that "in any way competes" with West includes much of the industry in which Ms. Sebree has built her career.

187. The Non-Compete Agreement therefore bars her from earning a living practicing as an intellectual property attorney in the pharmaceutical and medical device industries, including material and component suppliers in any capacity, anywhere in the world, for a twelve month period.

188. The restriction is not limited to the subject matter of Ms. Sebree's legal work at West, to the products she supported, to any confidential information she received, or to any customer she served.

189. The carve-out permitting Ms. Sebree to use "generic skills" applies only to a business "which is not in competition with the Company." It does not narrow the restriction on working for competitors in any capacity.

190. A restraint of this breadth is greater than reasonably necessary to protect any legitimate interest of West and imposes undue hardship on Ms. Sebree, and any other attorney's at West who are subject to the Non-Compete Agreement.

191. The Court should decline to rewrite the Non-Compete Agreement under the severability clauses. A court may refuse to blue-pencil a covenant whose overbreadth reflects overreaching by the employer.

192. West imposed a worldwide, industry-wide restraint on an attorney, enforced it only against its Black former executive, and used it to cost her a job, after being involuntarily separated from West.

**E. The Restricted Period Expires November 28, 2026 and Is Not Extended**

193. Section 1 of the Non-Compete Agreement restricts Ms. Sebree "for a period of 12 months from the date of termination of [her] employment." Section 7(c) of the RSU Agreement

likewise runs "for a period of twelve (12) months from the date of Termination of Service." Ms. Sebree's employment terminated on November 28, 2025.

194. Neither agreement contains a tolling or extension provision for any period of alleged breach. The only adjustment in the Non-Compete Agreement shortens the restricted period, by one day for each day of garden leave.

195. West's Legal Organization knew how to draft an extension when it wanted one. The RSU Agreement extends its restrictive covenants only during post-retirement continued vesting following a "Qualifying Retirement" or "Early Retirement" (RSU Agreement § 4(c)), which does not apply to Ms. Sebree. West included no comparable extension for any other circumstance.

196. As the drafter, West bears any ambiguity. Neither covenant may be extended beyond its express terms.

197. Ms. Sebree worked for Aptar only from June 15 2026 until July 27, 2026, when Aptar terminated her because of West's threats. West may not extend the restricted period by the duration of employment that its own discriminatory conduct ended.

**F. Additional Grounds for Unenforceability**

198. The Non-Compete Agreement is further unenforceable as to Ms. Sebree because:

(a) West, not Ms. Sebree, ended the employment relationship through an involuntary reduction in force, which diminishes any interest West could claim in restraining her;

(b) West sought to restrain Ms. Sebree for approximately 24 weeks, from June 12 through November 28, 2026, without any compensation; and

(c) the RSU Agreement covenant failed for want of consideration when West's termination of Ms. Sebree conveniently caused the forfeiture of all of her restricted stock units before any vested.

199. Ms. Sebree is entitled to a declaration that:

(a) the Non-Compete Agreement is contrary to the public policy of the Commonwealth of Pennsylvania as applied to an attorney, as expressed in Pa. RPC 5.6, and are void and unenforceable as to Ms. Sebree;

(b) West has no legitimate business interest in enforcing the Non-Compete Agreement against Ms. Sebree;

(c) the Non-Compete Agreement is overbroad and unenforceable, and the Court declines to modify them;

(d) the restricted period under the Non-Compete Agreement expires no later than November 28, 2026, and is not tolled or extended by Ms. Sebree's employment with Aptar or for any other reason;

(e) Ms. Sebree's employment with Aptar did not breach the Non-Compete Agreemen; and

(f) West is not entitled to damages, injunctive relief, forfeiture, recoupment, or any other remedy based on Ms. Sebree's employment with Aptar, including reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chyrrea Jackson Sebree respectfully requests that this Court enter judgment in her favor and against Defendant West Pharmaceutical Services, Inc., and award the following relief:

(a) A declaration that West's selective enforcement of its restrictive covenants against Plaintiff violated 42 U.S.C. § 1981;

(b) A declaration, as requested in Count III, that the Non-Compete Agreement is void as against public policy and unenforceable as to Plaintiff under Pa. RPC 5.6, that West has no legitimate business interest in enforcing them against her, that they are overbroad, that the restricted period expires no later than November 28, 2026 and is not extended, that her employment with Aptar did not breach them, and that West is not entitled to any remedy based on that employment;

(c) An injunction prohibiting West from communicating with Plaintiff's current or prospective employers regarding the restrictive covenants at issue;

(d) Back pay and lost benefits, including lost salary, short-term and long-term incentive compensation, and retirement contributions, from July 27, 2026 through the date of judgment;

(e) Front pay and lost future benefits;

(f) Compensatory damages for emotional distress, humiliation, and reputational harm, in an amount to be determined at trial;

(g) Punitive damages;

(h) Reasonable attorneys' fees and costs as an equitable award, and separately under 42 U.S.C. § 1988(b);

(i) Pre-judgment and post-judgment interest; and

(j) Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**THE BOOTH LAW FIRM**

By: *<u>/s/ Christopher R. Booth, Jr.</u>*
Christopher R. Booth, Jr., Esquire
Pa. Attorney I.D. No. 59395
711 West Avenue
Jenkintown, PA 19046
(215) 518-6683
christopher@theboothlawfirm.com
*Attorney for Plaintiff Chyrrea Jackson Sebree*

Dated: November 23, 2026

**EXHIBIT LIST**

| **Exhibit** | **Document** |
|---|---|
| A | Letter from David M. Lafkas to Chyrrea Jackson Sebree (July 2, 2026) |
| B | Non-Compete and Non-Solicitation Agreement (effective May 16, 2022) |
| C | Restricted Stock Unit Agreement (granted February 18, 2025) |